UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ALICIA OROZCO MICHEL,

                               Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

                               Defendant.

Civil No.    09-cv-2214-JLS (POR)

**REPORT AND RECOMMENDATION
GRANTING PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT,
DENYING DEFENDANT'S CROSS
MOTION FOR SUMMARY
JUDGMENT, AND REMANDING FOR
FURTHER PROCEEDINGS**

**[Document No. 14]
[Document No. 15]**

## I. INTRODUCTION

On October 7, 2009, Plaintiff Alicia Orozco Michel ("Plaintiff") filed a complaint pursuant to section 405(g) of the Social Security Act ("SSA") requesting judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner" or "Defendant") regarding the denial of Plaintiff's claim for disability insurance and supplemental security income benefits. (Doc. 1.) On April 30, 2010, Defendant filed an answer (Doc. 8) and the Administrative Record (Doc. 10).[1] On August 28, 2010, Plaintiff filed a motion for summary judgment regarding her 405(g) claim. (Doc. 14.) Plaintiff contends the Administrative Law Judge ("ALJ") failed to properly consider all of the available relevant medical evidence. (Doc. 14-1 at 8-11.) On September 27, 2010, Defendant filed a cross-motion for summary judgment and opposition to Plaintiff's motion

---

[1]Administrative Record, hereinafter "AR."

for summary judgment.  (Doc. 15.)

The Court finds the motions appropriate for submission on the papers and without oral argument pursuant to Local Rule 7.1(d)(1).  (See Doc. 13.)  For the reasons set forth herein, the Court RECOMMENDS granting Plaintiff's Motion for Summary Judgment, denying Defendant's Cross Motion for Summary Judgment, and remanding for further proceedings.

**II. PROCEDURAL BACKGROUND**

On July 26, 2006, Plaintiff filed an initial application for Disability Insurance Benefits and Supplemental Security Income.  (AR 7, 47-50.)  In both applications, Plaintiff alleged a disability beginning on July 25, 2006.  (Id.)  After a January 4, 2007 denial at the initial determination (AR 51-55) and a July 26, 2007, denial on reconsideration (AR 60-64), Plaintiff filed a timely request for hearing before an administrative law judge (hereinafter "ALJ") on September 25, 2007.  (AR 68.)  On May 28, 2009, Plaintiff testified at an administrative hearing before an ALJ.  (AR 22-46.)  She was represented by Elise Kellman, Esq.  (AR 22.)  Dr. Sydney Bolter, a medical expert, and John Kilcher, a vocational expert, also testified at the hearing.  (AR 22; 34-46.)  On June 19, 2009, the ALJ denied Plaintiff benefits.  (AR 7-16.)  The decision of the Social Security Administration (hereinafter "SSA") became final when the Appeals Council adopted the ALJ's findings by decision dated August 14, 2009.  (AR 1-3.)  Thereafter, Plaintiff filed the instant action in Federal Court on October 7, 2009.  (Doc. 1.)

**III. FACTUAL BACKGROUND**

Plaintiff was born on November 2, 1977 in Guadalajara, Mexico.  (AR 25; 276-77.)  At ten years old, Plaintiff sustained a traumatic brain injury with multiple periorbital fractures when her aunt's car was struck by another vehicle.  (AR 25-27; 244-48.)  Plaintiff was treated at the Rancho Los Amigos Medical Center in Los Angeles, California, where she remained in a coma for more than two weeks.  (AR 26; 244.)  Several months after the accident, Plaintiff had surgery to repair her orbital fractures.  (AR 26; 276-77.)  Plaintiff underwent months of rehabilitation, but as a result of her injury, she claims to suffer from moderate memory loss, a statistically significant difference between her performance and verbal IQ, as well as migraine headaches that occur four to five times a week and often last for days at a time. (AR 23-24; 28; 277.)

Plaintiff graduated from high school with below average grades and completed some courses at a community college. (AR 23.) From July, 2000 to August, 2006, Plaintiff held a series of temporary, part-time jobs, including receptionist, cashier, apartment manager and childcare worker. (AR 165-172.) For instance, Plaintiff claims she had significant difficulty remembering instructions and learning what to do on the job. (AR 281.) However, until 2006, Plaintiff was unaware that her symptoms were related to the car accident, which is why Plaintiff has stated her onset of disability is July 25, 2006. (AR 29-30; 281.) At the time of her hearing, Plaintiff was enrolled at the Acquired Brain Injury Program at Mesa College to learn strategies for coping with her cognitive impairments. (Id.)

1. **Medical Evidence**

   a. **Treating Physician Evidence**

On February 18, 2006, Plaintiff sought treatment from Dr. Erik Fenton Perkins for severe migraines, which occurred two to three times a week and were often associated with photophobia and nausea. (AR 303-05.)

On May 5, 2006, Plaintiff was referred to Dr. Barbara Schrock for a neuropsychological evaluation at the Sharp Rehabilitation Services' Psychology Department. (AR 294.) Dr. Schrock reviewed Plaintiff's medical records from the Rancho Los Amigos Medical Center's Pediatric Brain Injury Clinic. (AR 294-95.) Plaintiff's medical records from the time of the accident indicated she sustained a brain injury, as well as multiple periorbital fractures. (AR 294.) A head CT scan performed on December 18, 1987 read as normal. (Id.) After surgery to repair orbital fractures on February 4, 1988, Plaintiff received rehabilitation services at Rancho Los Amigos for several months. (AR 294-95.)

During the evaluation, Plaintiff reported she has continued to have frontal headaches at least four times a week since her accident. (AR 295.) At times, her headaches have been accompanied by vomiting and can be so severe that she is awaken from sleep. (Id.) Also, during the evaluation it was noted Plaintiff was alert and cooperative, hygiene and grooming were appropriate, and her speech was spontaneous and fluent. There was no evidence of aphasia, dysarthia, or dysnomia. Her affect was appropriate with no observable evidence of anxiety or depression and no evidence of a

1  formal thought disorder. Plaintiff appeared to understand all test instruction and effort appeared to
2  be maximal.  (Id.)

3          Testing revealed simple motor speed was in the average range bilaterally, fine motor
4  coordination was in the average range bilaterally, and uni-manual and bi-manual coordination was
5  within normal limits bilaterally with no evidence of ideometer, buccofacial or ideational apraxia.
6  (AR 295.)  Additionally, there was no evidence of motor disinhibition or motor preservation.  (Id.)
7  Dr. Schrock observed no evidence of apasia, dysarthria, or dysnomia.  (Id. at 296.)  Dr. Schrock
8  reported Plaintiff's affect was appropriate and there was no evidence of a formal thought disorder.
9  (Id.)

10          Plaintiff achieved the following IQ scores on the Wechsler Adult Intelligence Scale-III:
11  verbal IQ of 77, performance IQ of 98, and a full scale IQ of 85.  (AR 298.)  Dr. Schrock found that
12  the twenty-one point discrepancy between Plaintiff's verbal and performance IQ scores to be
13  statistically significant.  (Id.)  The neuropsychological defects noted in Plaintiff's profile included
14  mildly impaired verbal reasoning skills, mildly impaired working memory, significantly and
15  diffusely impaired learning and memory, and impaired ability to shift mental set.  (AR 299.)  Dr.
16  Schrock found evidence that Plaintiff's current verbal IQ was significantly lower than pre-morbid
17  estimates, suggesting the injury had a greater effect on the left hemisphere of her brain.  (Id.)  While
18  the interpretation of Plaintiff's verbal tests was somewhat complicated by her being bilingual, Dr.
19  Schrock found that the degree of discrepancy between Plaintiff's verbal and performance IQ scores
20  did not reflect bilingual factors only.  (AR 299-300.)  Rather, Dr. Schrock found the fact that
21  memory was diffusely impaired consistent with a history of significant brain injury.  (AR 300.)

22          Dr. Schrock concluded these test results would have implications on Plaintiff's daily life, as
23  well as her ability to maintain employment.  (AR 300.)  In regards to her headaches, Dr. Schrock
24  found stress and tension may have contributed to their severity.  (Id.)  She noted Plaintiff admitted to
25  significant difficulties remembering instructions and learning what to do on the job.  (Id.)  Dr.
26  Schrock found Plaintiff's failures in higher education consistent with these test results.  (Id.)  Based
27  on her test results, Dr. Schrock believed Plaintiff should be considered a disabled student if she
28  elected to continue her education.  (Id.)  Because Plaintiff was clearly unaware of the degree of

impact her childhood injury would have on her current life, Dr. Schrock opined that Plaintiff would benefit from rehabilitation, speech therapy, and a course to assist her in developing practical strategies for understanding and coping with her strengths and weaknesses.  (Id.)

From July 31, 2006 to February 22, 2007, Plaintiff sought treatment from Dr. E. B. Friedman, a specialist in adult neurology and psychiatry.  (AR 343-49.)  Plaintiff claimed to have problems with her memory since the injury; however, she believed her symptoms were getting worse.  (AR 347-48.)  She also reported signs of depression.  (AR 343-48.)  Dr. Friedman proscribed Plaintiff various doses of Effexor, Topomax and Imitrex to treat her posttraumatic migraine headaches.  (AR 343-46.)  He noted Plaintiff also took Excedrin to control the pain.  (AR 344.)

In 2006, Plaintiff was also referred to Dr. Boris Khamishon, a neurologist.[2]  (AR 219; 224.) Plaintiff reported taking Topamax for headaches, but reported she continued to have severe headaches up to four times a week that would last up to twenty-four hours.  (Id.)  She claimed her headaches were accompanied by photophobia and phonophobia, but no nausea or vomiting.  (Id.) Plaintiff also reported having two seizures within the past year and difficulty with memory.  (AR 409; 411.)  Dr. Khamishon diagnosed Plaintiff with residual posttraumatic head syndrome.  (AR 411.)  He proscribed Amitriptyline to help her sleep.  (AR 224.)

From October, 2007 to August, 2008, Plaintiff was treated by Dr. Sultana N. Hamrang, a psychiatrist.  (AR 219; 387-405.)  Plaintiff reported having marital problems (AR 400), as well as anger, hopelessness and memory problems.  (AR 400; 402.)  Dr. Hamrang diagnosed Plaintiff with a major depressive disorder and proscribed various medications, including Prozac, to treat her condition.  (AR 387-99; 404.)

At Dr. Khamishon's referral, Plaintiff received an MRI on February 6, 2009.  (AR 406.)  Dr. Louis Mass, the reading radiologist, found a mild nonspecific anterior frontal subcortical T2 weighted signaled hyperintensity with some dropout on the right on the gradient echo sequence. (Id.)  Dr. Maas determined these findings may have related to a previous brain contusion.  (Id.)  He noted old trauma may have also explained the minor band of gliosis seen in the splenium of the

---

[2] The Court notes Defendant disputes the characterization of Dr. Kamishon as a treating physician.  This issue will be addressed below.

1  corpus callosum, a typical location for shearing injuries.  (Id.)  Dr. Maas concluded migraine

2  headaches may be associated with subcortical T2 hyperintensity, but do not explain the T2

3  hyperintensity.  (Id.)

4      On May 26, 2009, Dr. Khamishon administered a residual functional capacity questionnaire.

5  (AR 413-422.)  Dr. Khamishon recorded Plaintiff's prognosis as guarded.  (AR 416.)  He found that

6  while Plaintiff has a headache, she would generally be precluded from performing even basic work

7  activities.  (Id.)  He also found she would be able to tolerate moderate stress in her work

8  environment.  (Id.)  Dr. Khamishon estimated Plaintiff would be absent from work more than four

9  times a month as a result of her impairments.  (AR 417.)

10      **b.      Examining Physician Evidence**

11      On June 14, 2007, Plaintiff was examined by Dr. Kenneth Stover, a board certified

12  neurologist, at the request of the Department of Social Services Disability and Adult Programs.  (AR

13  358-61.)  Plaintiff complained of migraines and memory loss.  (AR 358.)  She also claimed to have

14  memory problems with simple activities and difficulty remembering directions.  (AR 359.)  Plaintiff

15  reported she was taking the following medications: Imitrex, Excedrin, Effexor, hydrocodone,

16  ibuprofen and Topamax.  (AR 359.) Dr. Stover reviewed Dr. Schrock's medical records and her

17  notes on Plaintiff's medical history.  (AR 358.)  He noted Plaintiff's headaches are often precipitated

18  by stress and that Plaintiff had recently separated from her husband.  (AR 359.)

19      Dr. Stover diagnosed Plaintiff with orbital fractures by history, migraine by history and

20  memory loss by history.  (AR 361.)  He indicated Plaintiff had signs and symptoms consistent with

21  migraine tension issues, a mild learning disorder and mild recent memory.  (Id.)  However, when

22  questioned more deeply about various memory intense issues, Dr. Stover found Plaintiff was able to

23  answer such questions satisfactorily.  (Id.)  From a neurologic standpoint, Dr. Stover concluded

24  Plaintiff had no manipulative limitations and was not restricted in standing, walking, lifting or

25  carrying.  (Id.)  However, if Plaintiff has an intense headache, he found it would be difficult for her

26  to perform many of these tasks with the accompanying pain.  (Id.)  Finally, Dr. Stover determined

27  Plaintiff's memory issues would be best assessed with psychometric testing.  (Id.)

28      On July 23, 2007, Plaintiff was seen by Dr. Douglas Engelhorn for a psychiatric consultation

as part of her evaluation for Social Security disability. (AR 381-84.) Dr. Engelhorn reviewed

Plaintiff's medical and work history. (AR 381.) Plaintiff reported she was not taking any

medications at the time of the appointment, but that she expected to have her prescription for

Effexor refilled in the near future. (AR 382.) Plaintiff further reported she has had frequent

migraine headaches, often four to six per week. (Id.) She stated the headaches last anywhere from

several hours to a full day in duration and are often accompanied by nauseousness and sensitivity to

light. (Id.) Finally, Plaintiff also reported she had been struggling with depression for at least seven

years and was seen by a psychiatrist in early 2007. (Id.) She stated that much of her depression was

related to marital discord and felt Effexor minimized her symptoms of depression. (Id.)

Plaintiff stated she takes on many household tasks, including cooking, cleaning, child care,

laundry and grocery shopping, though usually in the company of a relative. (Id.) She claimed she

was capable of driving a car and attended church regularly. (Id.) Based thereon, Dr. Engelhorn

found Plaintiff was capable of taking care of her basic needs. (Id.) During the evaluation, Plaintiff

appeared alert, cooperative and oriented in all spheres. (Id.) She was dressed appropriately and

appeared to be of average intelligence. (Id.) Dr. Engelhorn noted no evidence of psychosis, active

depression or significant levels of anxiety. There was no evidence of psychomotor retardation, flat

affect, loosening of associations, delusions or hallucinations. (AR 383.) Upon questioning, Dr.

Engelhorn noted Plaintiff's concentration and attention seemed unimpaired, though she had

difficulty at some points. (Id.)

He diagnosed Plaintiff with depressive disorder and concluded there was very minimal

impairment from her brain injury. (Id.) He assessed Plaintiff with a Global Assessment of

Functioning (GAF) score of 70. (Id.) Dr. Engelhorn found her daily activities were within normal

limits and noted Plaintiff was capable of driving to and from work. (Id.) He determined Plaintiff

was capable of performing simple, repetitive tasks, and could probably also perform complex and

detailed work. (Id.) As judged by her presentation at the appointment, Dr. Engelhorn found she

could adequately relate to peers and supervisors in the workplace and could be expected to make

routine adjustments on the job. (Id.) In sum, Dr. Engelhorn concluded there was no evidence of

cognitive impairment. (Id.)

//

**2.**     **The Hearing**

     **a.**     **Plaintiff's Testimony**

At the hearing, Plaintiff described the car accident and testified that she has suffered from migraine headaches ever since.  (AR 25-28.)  She testified she has a migraine almost every day and up to four or five times a week.  (AR 28.)  She reported taking Simatriptan and multiple doses of Excedrin Migraine for the pain.  (AR 28-29.)  Plaintiff stated she lived with her parents and had no social life apart from her family.  (AR 31.)

Plaintiff testified that her migraines had significantly impaired her ability to maintain competitive employment.  If she felt the onset of a migraine at work, Plaintiff claimed she would have to leave as soon as possible because it would be impossible to focus on her work or finish out the day.  (AR 29.)  She also testified she had to leave her last position as a customer service representative because she was often confused and unable to remember directions.  (Id.)  Though Plaintiff had suffered from headaches and memory loss since the accident, she testified that she did not realize her problems were related to her brain injury until 2006.  (AR 30.)  In response to questioning from the ALJ, Plaintiff stated she could perform household tasks, such as washing dishes or sweeping floors.  (AR 31.)  However, Plaintiff stated she would be unable to accept a job performing such tasks because migraines would interrupt her ability to work on a regular basis.  (AR 32.)  Because she was unable to hold a steady job, Plaintiff testified she had enrolled at Mesa College's Acquired Brain Injury Program to learn strategies to cope with her brain injury.  (AR 23-24; 33.)  She hoped the program would give her the skills she needed to start over.  (AR 34.)

     **b.**     **The Medical Expert's Testimony**

Medical expert Dr. Sydney Bolter, a board-certified psychiatrist, also testified at the hearing. (AR 22; 34-45.)  Dr. Bolter testified he had reviewed the file in the case and reviewed the new evidence rather briefly.  (AR 35.)  Dr. Bolter did not review Dr. Hamrang's medical reports, however, because he found them difficult to read.  (Id.)  Nevertheless, Dr. Bolter claimed he had sufficient evidence to formulate an opinion as to Plaintiff's condition.  (Id.)

Although Dr. Bolter did not examine Plaintiff, at the hearing, Dr. Bolter questioned Plaintiff

1   about her ability to interact with other students in her classes.  (AR 35.)  Plaintiff responded that she

2   did not talk to her peers at all because she had to focus to concentrate on her teacher. (AR 35-36.)

3   He also questioned Plaintiff regarding the medications she had been prescribed by various

4   physicians. (AR 37.)  At the time of the hearing, Plaintiff testified she was taking Elavil, Topamaz,

5   Zoloft, Imitrex, and Amitriptylene for migraines and depression.  (AR 37-38.)

6        Dr. Bolter testified there was conflicting evidence in the record regarding the severity of

7   Plaintiff's condition.  (Id.)  He stated that if one took Dr. Englehorn's report literally, it would

8   indicate Plaintiff could do almost anything.  (AR 37.)  Specifically, Dr. Bolter noted that Dr.

9   Englehorn's exam yielded no evidence of impaired memory.  (AR 40.)  Yet Dr. Bolter seemed to

10  agree with Dr. Schrock's assessment that the significant difference between Plaintiff's verbal and

11  performance IQ scores was statistically significant and could indicate a brain injury or damage to

12  mental involvement.  (AR 38.)  Dr. Schrock's exam also indicated Plaintiff had impaired problems

13  with working memory index, vocabulary and processing speed.  (AR 40.)  Dr. Bolter explained Dr.

14  Englehorn and Dr. Schrock had limited contact with Plaintiff, which could explain their conflicting

15  opinions.  (Id.)  However, Dr. Bolter concluded Dr. Englehorn's determination that Plaintiff could

16  do complex tasks was not supported anywhere else in the record.  (AR 42.)

17       According to his review of Plaintiff's medical records, Dr. Bolter diagnosed Plaintiff with an

18  organic mental illness as a result of brain injury.  (AR 40.)  Though Plaintiff was unaware that her

19  brain injury would have an impact on her current life, Dr. Bolter did not find any evidence her

20  condition was getting worse.  (AR 39.)  At most, he found Plaintiff's daily activities would be

21  moderately limited by her condition, but her social functioning would be markedly limited. (AR 40-

22  41.)  Dr. Bolter determined Plaintiff would be able to concentrate on very simple, repetitive tasks.

23  (AR 41.)  In his opinion, Plaintiff's injury had caused memory impairment.  (Id.)  He believed

24  Plaintiff would function best in a low stress environment as it would be difficult for her to complete

25  even simple tasks if suffering from migraine headaches.  (AR 42.)

26       **c.   The Vocational Expert's Testimony**

27       Vocational expert John Kilcher testified briefly at Plaintiff's hearing.  (AR 45-46.)  He

28  characterized Plaintiff's past work was light level and semi-skilled.  (AR 46.)

1    //

2    **3.**    **The ALJ's Findings**

3    After consideration of all the evidence, the ALJ concluded Plaintiff has not been under a

4 disability, as defined by the SSA, from July 25, 2006 through the date of his decision.  (AR 16.)

5 Specifically, the ALJ concluded: (1) Plaintiff meets the insured status requirements of the SSA

6 through December 31, 2011; (2) Plaintiff has not engaged in gainful activity since July 25, 2006, the

7 alleged onset date; (3) Plaintiff suffers from the severe impairments of migraine headaches and

8 memory loss, which cause significant limitation in Plaintiff's ability to perform basic work

9 activities; (4) Plaintiff's mental impairment does not meet or medically equal one of the listed

10 impairments in

11 20 CFR Part 404, Subpart P, Appendix 1; (5) Plaintiff has the residual functional capacity[3] to

12 perform a full range of work at all exertional levels with non-exertional limitations, including she

13 can understand, remember and carry out only simple, one or two-step instructions, she can relate and

14 interact with supervisors, co-workers and the general public, she can maintain concentration and

15 attention for simple, repetitive works, and she can tolerate a moderate level of job-related stress; (6)

16 Plaintiff is unable to perform any past relevant work; (7) Plaintiff was born on November 2, 1977

17 and was 28 years old, which is defined as a younger individual age 18-44, on the alleged disability

18 onset date; (8) Plaintiff has at least a high school education and is able to communicate in English;

19 (9) Transferability of job skills is not material to the determination of disability because using the

20 Medical-Vocational Rules as a framework supports a finding that Plaintiff is "not disabled," whether

21 or not Plaintiff has transferable job skills; and (10) There are jobs that exist in significant numbers in

22 the national economy that Plaintiff can perform.  (AR 9-16.)

23    The ALJ's findings reflect he considered opinion evidence, Plaintiff's symptoms, and the

24 extent to which Plaintiff's symptoms were consistent with the objective medical evidence and other

25 evidence.  (AR 11-14.)  In determining Plaintiff's RFC, the ALJ considered the opinions of Dr.

26 Schrock, Dr. Stover, Dr. Engelhorn, and Dr. Bolter, as well as the results of an MRI scan taken of

27 Plaintiff's brain on February 6, 2009.  (AR 11-13.)  The ALJ noted the following observations made

28

[3] Residual functional capacity, hereinafter "RFC."

by Dr. Schrock:

//

> During the evaluation it was noted [Plaintiff] was alert and cooperative, hygiene and grooming were appropriate, and her speech was spontaneous and fluent. There was no evidence of aphasia, dysarthria, or dysnomia. Her affect was appropriate with no observable evidence of anxiety or depression and no evidence of a formal thought disorder. [Plaintiff] appeared to understand all test instruction and effort appeared to be maximal. Testing revealed simple motor speed was in the average range bilaterally, fine motor coordination was in the average range bilaterally, and uni-manual and bi-manual coordination was within normal limits bilaterally with no evidence of ideometer, buccofacial or ideational apraxia. Additionally, there was no evidence of motor disinhibition or motor preservation.

(AR 11-12.) Further, the ALJ noted that according to the Wechsler Adult Intelligence Scale-III, Plaintiff's verbal comprehension, expressive vocabulary, arithmetic performance and working memory were only mildly impaired. (AR 12.) Plaintiff's sustained concentration in the visual modality and processing speed were in the average range. (AR 12.)

With regard to Dr. Stover, the ALJ noted he reported Plaintiff had signs and symptoms consistent with migraine tension complex issues and the psychometric testing was indicative of a mild learning disorder and mild recent memory. (AR 12.) Further, the ALJ noted Dr. Stover concluded Plaintiff "is not restricted in standing, walking, sitting, lifting, or carrying, pushing, or pulling. Additionally, she is not restricted with any postural functions such as climbing, balancing, stooping, kneeling, or crouching; and no manipulative limitations as to reaching, handling, or fingering." (AR 12.)

With regard to Dr. Engelhorn, the ALJ considered his observations that Plaintiff was not taking any medications and that although she alleged a seven year history of depression, she only started receiving treatment a few months earlier, which could be related to marital discord. (AR 12.) The ALJ also noted Dr. Engelhorn found there was no evidence of any psychosis, active depression or significant levels of anxiety. (AR 12.) Further, the ALJ considered Dr. Engelhorn's diagnosis that Plaintiff suffered from a depressive disorder and partner relational problems, and assessed her Global Assessment of Functioning at 70, which suggests only mild symptoms. (AR 12.)

As to Dr. Bolter, the ALJ relied on his testimony that the evidence supported the diagnosis of migraines and mild depression. (AR 13.) Further, Dr. Bolter opined that Plaintiff's memory impairment would result in her experiencing a moderate restriction in activities of daily living,

marked difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence and pace.  (AR 13.)  Based thereon, Dr. Bolter concluded it would be best for Plaintiff to be limited to simple, repetitive tasks in a low key job that would not stress one with migraines.  (AR 13.)

Moreover, the ALJ found that to the extent it is alleged Plaintiff cannot work at the RFC as recited above, "those allegations are not totally credible."  (AR 13.)  The ALJ noted the following: (1) Plaintiff's activities of daily life did not indicate a disabling level of impairment of Plaintiff's RFC; (2) Dr. Schrock concluded Plaintiff revealed no evidence of aphasia, dysarthia, or dysnomia and her affect was appropriate; (3) Dr. Schrock noted Plaintiff appeared to understand all test instructions; (4) Dr. Engelhorn noted Plaintiff was not currently taking medications, which is not consistent with someone who has a disabling level of impairment; (5) Plaintiff only started receiving treatment for her depression a few months prior to seeing Dr. Engelhorn; (6) Plaintiff stated much of her depression was related to marital discord; (7) Dr. Engelhorn found there was no evidence of any psychosis, active depression or significant levels of anxiety; (8) No physician opined that listing level limitations were ever met or equaled; and (9) the objective evidence of the claimant's medical record does not establish impairments likely to produce disabling pain or other limitations as alleged for any period of 12 or more continuous months.  (AR 13-14.)

## IV. DISCUSSION

### 1.    Legal Standard Regarding Review of Denial of Disability Claim

To qualify for disability benefits under the Social Security Act, applicants must show two things:  (1) They suffer from a medically determinable impairment that can be expected to last for a continuous period of twelve months or more, or would result in death; and (2) the impairment renders applicants incapable of performing the work they previously performed or any other substantially gainful employment that exists in the national economy.  See 42 U.S.C.A. §§ 423(d)(1)(A), (2)(A) (West Supp. 2008).  An applicant must meet both requirements to be classified as "disabled."  Id.

Sections 205(g) and 1631(c)(3) of the Social Security Act allow applicants whose claims have been denied by the SSA to seek judicial review of the Commissioner's final agency decision.

1   42 U.S.C.A. §§ 405(g), 1383(c)(3) (West Supp. 2008).  The Court should affirm the decision unless

2   "it is based upon legal error or is not supported by substantial evidence."  Bayliss v. Barnhart, 427

3   F.3d 1211, 1214 n.1 (9th Cir. 2005) (citing Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1999)).

4          "Substantial evidence is such relevant evidence as a reasonable mind might accept as

5   adequate to support [the ALJ's] conclusion[,]," considering the record as a whole.  Webb v. Barnhart,

6   433 F.3d 683, 686 (9th Cir. 2005) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)).  It

7   means "'more than a mere scintilla but less than a preponderance[]'" of the evidence.  Bayliss, 427

8   F.3d at 1214 n.1 (quoting Tidwell, 161 F.3d at 601).  "'[T]he court must consider both evidence that

9   supports and the evidence that detracts from the ALJ's conclusion . . . .'"  Frost v. Barnhart, 314

10  F.3d 359, 366-67 (9th Cir. 2002) (quoting Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).

11         To determine whether a claimant is "disabled," the Social Security regulations use a five-step

12  process outlined in 20 C.F.R. § 404.1520 (2008).  If an applicant is found to be "disabled" or "not

13  disabled" at any step, there is no need to proceed further.  Ukolov v. Barnhart, 420 F.3d 1002, 1003

14  (9th Cir. 2005) (quoting Schneider v. Comm'r of Soc. Admin., 223 F.3d 968, 974 (9th Cir.

15  2000)).  Although the ALJ must assist the applicant in developing a record, the applicant bears the

16  burden of proof during the first four steps.  Tackett v. Apfel, 180 F.3d 1094, 1098 & n.3 (9th Cir.

17  1999).  If the fifth step is reached, however, the burden shifts to the Commissioner.  Id. at 1098.  The

18  steps for evaluating a claim are as follows:

19            **Step 1.**  Is the claimant presently working in a substantially gainful activity?
          If so, then the claimant is "not disabled" within the meaning of the Social Security
20        Act and is not entitled to disability insurance benefits.  If the claimant is not working
          in a substantially gainful activity, then the claimant's case cannot be resolved at step
21        one and the evaluation proceeds to step two.

22            **Step 2.**  Is the claimant's impairment severe?  If not, then the claimant is "not
          disabled" and is not entitled to disability insurance benefits.  If the claimant's
23        impairment is severe, then the claimant's case cannot be resolved at step two and the
          evaluation proceeds to step three.

24
              **Step 3.**  Does the impairment "meet or equal" one of a list of specific
25        impairments described in the regulations?  If so, the claimant is "disabled" and
          therefore entitled to disability insurance benefits.  If the claimant's impairment
26        neither meets nor equals one of the impairments listed in the regulations, then the
          claimant's case cannot be resolved at step three and the evaluation proceeds to step
27        four.

28
              **Step 4.**  Is the claimant able to do any work that he or she has done in the

past?  If so, then the claimant is "<u>not</u> <u>disabled</u>" and is not entitled to disability insurance benefits.  If the claimant cannot do any work he or she did in the past, then the claimant's case cannot be resolved at step four and the evaluation proceeds to the fifth and final step.

**Step 5.**  Is the claimant able to do any other work?  If not, then the claimant is "<u>disabled</u>" and therefore entitled to disability insurance benefits.  If the claimant is able to do other work, then the Commissioner must establish that there are a significant number of jobs in the national economy that claimant can do.  There are two ways for the Commissioner to meet the burden of showing that there is other work in "significant numbers" in the national economy that claimant can do:  (1) by the testimony of a vocational expert, or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2.  If the Commissioner meets this burden, the claimant is "<u>not</u> <u>disabled</u>" and therefore not entitled to disability insurance benefits.  If the Commissioner cannot meet this burden, then the claimant is "<u>disabled</u>" and therefore entitled to disability benefits.

<u>Id.</u> at 1098-99 (footnotes and citations omitted); <u>see also</u> <u>Bustamante v. Massanari</u>, 262 F.3d 949, 954 (9th Cir. 2001) (giving an abbreviated version of the five steps).

Section 405(g) permits this Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision.  42 U.S.C.A. § 405(g).  The matter may also be remanded to the Social Security Administration for further proceedings.  <u>Id.</u>  After a case is remanded and an additional hearing is held, the Commissioner may modify or affirm the original findings of fact or the decision. <u>Id.</u>

"If the evidence can reasonably support either affirming or reversing the Secretary's conclusion, the court may not substitute its judgment for that of the Secretary." <u>Flaten v. Sec'y Health & Human Servs.</u>, 44 F.3d 1453, 1457 (9th Cir. 1995).  The Court must uphold the denial of benefits if the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision.  <u>Burch v. Barnhart</u>, 400 F.3d 676, 679 (9th Cir. 2005).

**2.**   **Analysis**

Plaintiff contends the ALJ committed legal error in ignoring the opinions of Dr. Khamishon, Plaintiff's treating physician, Dr. Stover, Plaintiff's examining physician, and Dr. Bolter, a medical expert.  (Doc. 14-1 at 8-11.)  Defendant contends the ALJ properly evaluated the medical evidence and gave greatest weight to Dr. Bolton's opinion, the testifying medical expert.  (Doc. 15-1 at 6-9.)  For the sake of clarity, the Court will address each opinion separately.

**a.**      **Disregarding Findings of Treating Physician**

Plaintiff contends the ALJ committed legal error in failing to consider Plaintiff's treating

physician, Dr. Khamishon's, opinion in his decision.  (Doc. 14-1 at 9-10.)  Specifically, Plaintiff contends the ALJ should have addressed Dr. Khamishon's conclusion that during one of her migraine headaches, Plaintiff would be precluded from even basic work activities and would have to take a break from the workplace.  Id.  Additionally, Plaintiff contends the ALJ should have considered Dr. Khamishon's conclusion that Plaintiff would be absent from work more than four times a month as a result of her impairment.  Id. at 10.

Defendant contends Plaintiff incorrectly labels Dr. Khamishon as a treating physician.  (Doc. 15-1 at 7-8.)  Defendant contends the proper classification of Dr. Khamishon as an examining physician reveals the ALJ's analysis was entirely proper.  Id.

"Cases in [the Ninth Circuit] distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)."  Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).  The opinions of treating doctors are generally given more weight than the opinions of nontreating doctors.  Id. (citing Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987)).  The opinion of an examining doctor is entitled to greater weight than that of a nonexamining doctor.  Id. (citing Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir. 1990); Gallant v. Heckler, 753 F.2d 1450 (9th Cir. 1984)).  However, "[t]he findings of a nontreating, nonexamining physician can amount to substantial evidence, so long as other evidence in the record supports those findings."  Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996).

A treating physician is one who has provided treatment to a claimant on more than one occasion.  It is not practical to draw a bright line between treating and nontreating physicians; instead the distinction is based upon the duration of the relationship and the frequency and nature of the contact.  Le v. Astrue, 529 F.3d 1200, 1201 (9th Cir. 2008).  A physician qualifies as a treating source if the claimant sees her with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for the medical condition.  Benton v. Barnhart, 331 F.3d 1030, 1036 (9th Cir. 2003).

According to 20 C.F.R. § 404.1527(d), a treating physician's opinion must be accorded

1  controlling weight if it is "well supported by medically acceptable clinical and laboratory diagnostic

2  techniques and . . . not inconsistent with the other substantial evidence in [the] case record . . . ." 20

3  C.F.R. § 404.1527(d)(2) (2009). If the treating physician's opinion is not given controlling weight,

4  the following factors are applied in determining what weight to give the opinion: (1) the length of

5  the

6  treatment relationship and the frequency of examination, (2) the nature and extent of the treatment

7  relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record

8  as a whole, (5) the specialization of the treating physician, and (6) any other factors brought to the

9  attention of the ALJ which tend to support or contradict the opinion.  Id. § 404.1527(d)(2)(i)-(ii),

10  (d)(3)-(6).

11       Opinions of treating physicians may only be rejected under certain circumstances.  See

12  Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004).  "[W]here the treating

13  doctor's opinion is not contradicted by another doctor, it may be rejected only for 'clear and

14  convincing' reasons."  Lester, 81 F.3d at 830 (citing Baxter v. Sullivan, 923 F.2d 1391, 1396 (9th

15  Cir. 1991)); see also Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002).  "Even if the treating

16  doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion

17  without providing 'specific and legitimate reasons' supported by substantial evidence in the record .

18  . . ."  Lester, 81 F.3d at 830 (citing Murray v. Heckler, 722 F.2d 499, 502 (9th Cir. 1983)).  And like

19  the opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by another

20  doctor, can only be rejected for specific and legitimate reasons that are supported by substantial

21  evidence in the record.  Lester, 81 F.3d at 830-31 (citing Andrews v. Shalala, 53 F.3d 1035, 1043

22  (9th Cir.1995)).

23       Here the ALJ neither addressed nor explained the weight given to Plaintiff's treating

24  neurologist, Dr. Khamishon's opinion.[4]  The record shows Dr. Khamishon saw Plaintiff on January

25  28, 2009 for a neurological consultation, and again on February 4, 2009 for testing.  (AR 408-411.)

26

27       [4] The Court also notes the ALJ fails to mention Dr. Friedman and Dr. Hamrang, both of whom
28  were Plaintiff's treating physicians.  Because Plaintiff does not mention these physicians in her Motion for Summary Judgment, the Court shall not address the ALJ's failure to consider these physicians' opinions.

1  After a neurological evaluation, Dr. Khamishon diagnosed Plaintiff with residual posttraumatic head

2  syndrome.  (AR 411.)  He proscribed Amitriptyline to help her sleep and requested an MRI and

3  EEG.  (AR 224, 411.)  Upon Dr. Khamishon's request, on February 6, 2009, Plaintiff received an

4  MRI in which Dr. Louis Mass, the reading radiologist, found a mild nonspecific anterior frontal

5  subcortical T2 weighted signaled hyperintensity with some dropout on the right on the gradient echo

6  sequence.  (AR 406.)  On May 26, 2009, Dr. Khamishon completed a residual functional capacity

7  questionnaire.  (AR 413-422.)  Dr. Khamishon recorded Plaintiff's prognosis as guarded.  (AR 416.)

8  He found that while Plaintiff has a headache, she would generally be precluded from performing

9  even basic work activities.  (Id.)  He also found she would be able to tolerate moderate stress in her

10  work environment.  (Id.)  Dr. Khamishon estimated Plaintiff would be absent from work more than

11  four times a month as a result of her impairments.  (AR 417.)

12  Contrary to Defendant's assertion, based on the above record of treatment, Dr. Khamishon

13  qualifies as a treating physician.  Dr. Khamishon's initial  neurological evaluation of Plaintiff,

14  testing, diagnosis, prescription of medication, and referring Plaintiff to receive an MRI is consistent

15  with the accepted medical practice for the type of treatment and/or evaluation required for Plaintiff's

16  neurological condition.  Benton v. Barnhart, 331 F.3d 1030, 1036 (9th Cir. 2003).  Therefore, the

17  ALJ's failure to give specific, legitimate reasons for disregarding Dr. Khamishon's, a treating

18  physician's opinion, is legal error.  See Batson, 359 F.3d at 1195.  "[I]f the ALJ rejects significant

19  probative evidence, he must explain why."  Lusardi v. Astrue, No. 08-35712, 2009 WL 3497739, at

20  *2.  However, even if Dr. Khamishon is considered an examining physician rather than a treating

21  physician, the ALJ still committed legal error in failing to provide specific and legitimate reasons

22  that are supported by substantial evidence in the record for rejecting Dr. Khamishon's opinion.

23  Lester, 81 F.3d at 830-31.

24  For these reasons, the Court RECOMMENDS Plaintiff's Motion for Summary Judgment as

25  relates to Dr. Khamishon be **GRANTED** and Defendant's Cross Motion for Summary Judgment as

26  relates to Dr. Khamishon be **DENIED**.  Further, the Court RECOMMENDS a **REMAND** is in order

27  to address Dr. Khamishon's opinions and limitations he imposed on Plaintiff.

28  **b.    Disregarding Findings of Examining Physician**

1    Plaintiff contends the ALJ committed legal error in disregarding Dr. Stover's, an examining

2    physician's,[5] opinion that if Plaintiff has an intense headache, it would be difficult for her to perform

3    many tasks with the accompanying pain. (Doc .14-1 at 8-9.)

4    Defendant contends the ALJ properly considered Dr. Stover's conclusion that Plaintiff would

5    have no physical limitations. (Doc. 15-1 at 7.)

6    As stated above, the opinion of an examining doctor, even if contradicted by another doctor,

7    can only be rejected for specific and legitimate reasons that are supported by substantial evidence in

8    the record. Lester, 81 F.3d at 830-31 (citing Andrews v. Shalala, 53 F.3d 1035, 1043 (9th Cir.1995)).

9    Here, the ALJ adopted Dr. Stover's opinion that Plaintiff would have no physical limitations.

10   In his decision, the ALJ noted Dr. Stover reported Plaintiff had signs and symptoms consistent with

11   migraine tension complex issues and the psychometric testing was indicative of a mild learning

12   disorder and mild recent memory. (AR 12.) Further, the ALJ noted Dr. Stover concluded Plaintiff

13   "is not restricted in standing, walking, sitting, lifting, or carrying, pushing, or pulling. Additionally,

14   she is not restricted with any postural functions such as climbing, balancing, stooping, kneeling, or

15   crouching; and no manipulative limitations as to reaching, handling, or fingering." (AR 12.)

16   However, the ALJ did not address Dr. Stover's statement that "[i]f [Plaintiff] has [an] intense

17   headache, it would be difficult for her to perform many of these tasks with the accompanying pain."

18   (AR 361.) Also, Dr. Bolter, a medical expert, and Dr. Khamishon, a treating physician, made

19   similar statements with regard to Plaintiff's potential inability to perform tasks while experiencing a

20   migraine. (AR 13, 416.) In disregarding Dr. Stover's, Dr. Bolter's and Dr. Khamishon's opinions, it

21   is not apparent whether the ALJ accounted for Plaintiff's migraines in his RFC determination.

22   Thus, the Court finds the ALJ committed legal error by failing to provide specific and

23   legitimate reasons for disregarding opinion evidence of Plaintiff's examining physician, Dr. Stover.

24   Lester, 81 F.3d at 830-31. For these reasons, the Court RECOMMENDS Plaintiff's Motion for

25   Summary Judgment as relates to Dr. Stover be **GRANTED** and Defendant's Cross Motion for

26   Summary Judgment as relates to Dr. Stover be **DENIED**. Further, the Court RECOMMENDS a

27

28   _____

     [5] From Plaintiff's Motion for Summary, it seems Plaintiff characterizes Dr. Stover as a state
     agency medical expert. However, a review of the record indicates Dr. Stover is an examining physician.

1    **REMAND** is in order to address Dr. Stover's opinions and limitations he imposed on Plaintiff.

2            **c.**    **Disregarding Findings of Medical Expert Witness**

3          Plaintiff contends the ALJ committed legal error in disregarding Dr. Bolter's conclusion that

4    Plaintiff would be limited to a low stress job and finding that Plaintiff can tolerate a moderate level

5    of job-related stress.  (Doc. 14-1 at 8-9.)

6          Defendant contends the ALJ gave greatest weight to testifying medical expert Dr. Bolter's

7    opinion about Plaintiff's RFC and found Plaintiff could handle simple, one or two-step tasks with

8    moderate stress.  (Doc. 15-1 a t 6.)  First, Defendant contends Dr. Bolter did not state Plaintiff was

9    limited to low-stress work.  Id. at 7.  Further, Defendant contends regardless of whether the ALJ did

10   not fully credit Dr. Bolter's opinion, it is not necessary to agree with everything an expert witness

11   says in order to hold that his testimony contains substantial evidence.  Id.

12         ALJ's are not bound by any findings made by state agency medical or psychological

13   consultants.  20 C.F.R. § 404.1527.  Because reviewing physicians do not consider subjective

14   factors, such as pain and fatigue, in determining the claimant's work ability, courts have found their

15   conclusions to be of limited value.  Penny v. Sullivan, 2 F.3d 953, 957 (9th Cir. 1993.)  However,

16   state agency medical consultants and other program physicians are highly qualified physicians who

17   are also experts in social security disability evaluation.  (Id.)  Accordingly, "[f]indings of fact made

18   by State agency medical and psychological consultants...regarding the nature and severity of an

19   individual's impairment(s) must be treated as expert opinion evidence of nonexamining sources at

20   the administrative law judge and Appeal Council levels of administrative review."  Social Security

21   Ruling § 96-6p.  Further "administrative law judges and the Appeal Council may not ignore these

22   opinions and must explain the weight given to these opinions in their decisions."  (Id.)

23         Here, the ALJ neither addressed nor explained the weight given to Dr. Bolter's opinion

24   regarding the level of job-related stress Plaintiff had the capacity to experience.  Dr. Bolter, a

25   medical expert, testified  that with regard to concentration, persistence, and pace, Plaintiff should be:

26           [R]estricted to simple, repetitive tasks or contact.  If she tried to do more than that,
          even though Dr. Engelhorn says she can do complex tasks, I just can't find that supported

27        anywhere else in the record.  The best we could have would be simple tasks.  And the
          migraine is going to play a part in this, but those are always difficult to evaluate except from

28        testimony.  The neurologist says she does have migraines.  She's being treated for it.  It's
          difficult to place that into the total picture.  But it's going to cause problems.  Again, some

types of job[s] where *low* stress, so that they would not precipitate a migraine. [sic] (AR 42) (emphasis added).  However, the ALJ found Plaintiff has an RFC to perform a full range of work at all exertional levels with non-exertional limitations, including she can understand, remember and carry out only simple, one or two-step instructions, she can relate and interact with supervisors, co-workers and the general public, she can maintain concentration and attention for simple, repetitive works, and she can tolerate a *moderate* level of job-related stress.  (AR 11-13) (emphasis added). Although the ALJ did partially consider Dr. Bolton's opinion about Plaintiff's RFC, the ALJ failed to explain the weight given to Dr. Bolter's statements about the job-related stress levels and why he disagreed with Dr. Bolter.  Social Security Ruling § 96-6p.

Thus, the Court finds the ALJ committed legal error by failing to explain the weight given to Dr. Bolter's statements about job-related stress levels.  Accordingly, the Court RECOMMENDS Plaintiff's Motion for Summary Judgment as relates to Dr. Bolter be **GRANTED** and Defendant's Cross Motion for Summary Judgment as relates to Dr. Bolter be **DENIED**.  Further, the Court RECOMMENDS a **REMAND** is in order to address Dr. Bolter's opinions and limitations he imposed on Plaintiff.

## V. CONCLUSION

After a thorough review of the record in this matter and based on the foregoing analysis, this Court RECOMMENDS Plaintiff's Motion for Summary Judgment be **GRANTED**, Defendant's Cross Motion for Summary Judgment be **DENIED**, and the case be **REMANDED** for further proceedings.

This Report and Recommendation of the undersigned Magistrate Judge is submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1) (2007) and Local Rule 72.1(d).

IT IS HEREBY ORDERED that **no later than February 25, 2011**, any party may file and serve written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

//

//

1  //

2          IT IS FURTHER ORDERED that any reply to the objections shall be filed and served **no**

3  **later than ten days** after being served with the objections.  The parties are advised that failure to

4  file objections within the specified time may waive the right to raise those objections on appeal of

5  the Court's order.  Martinez v. Y1st, 951 F.2d 1153, 1156-57 (9th Cir. 1991).

6          **IT IS SO ORDERED.**

7  DATED:  February 11, 2011

8

9                                           LOUISA S PORTER
                                            United States Magistrate Judge
10

11  cc:          The Honorable Janis L. Sammartino
                 all parties
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28